IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CONA-LISA WILLIAMS and                    06-CV-355-BR
DARRELL A. WILLIAMS, SR.,
as Natural Guardians to                   OPINION AND ORDER
EBONY WILLIAMS,

        Plaintiffs,

v.

PAMELA ROSENTRETER and
CITY OF PORTLAND,

        Defendants.


CEDRIC R. BROWN
720 N.E. Flanders Street
Suite 204
Portland, OR 97232
(503) 231-4669

       Attorney for Plaintiff

LISA MENG
City Attorney
WILLIAM W. MANLOVE
Deputy City Attorney
1221 S.W. Fourth Avenue
Suite 430
Portland, OR 97204
(503) 823 4047

       Attorneys for Defendants

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on the Motion for Summary Judgment (#27) filed by Defendants Pamela Rosentreter and City of Portland as to all of Plaintiffs' claims.  In Claim One, pursuant to 42 U.S.C. § 1983, Plaintiffs allege Sergeant Rosentreter violated Williams's[1] Fourth Amendment right to be free from unreasonable search and seizure.  In Claim Two, Plaintiffs allege the City of Portland intentionally inflicted severe emotional distress (IIED claim) on Williams in violation of Oregon common law.

The Court heard oral argument on March 7, 2007.  At that time, Plaintiffs stipulated that Claim One brought pursuant to § 1983 applies only to Sergeant Rosentreter and Claim Two for IIED applies only to the City of Portland.

For the reasons that follow, the Court **DENIES** Defendants' Motion as to Claim One and **GRANTS** Defendants' Motion as to Claim Two.


<u>BACKGROUND</u>

On June 9, 2005, at around 11:30 p.m., an attack involving between five and seven African-American youths took place on the "Yellow Line" of the Portland Metro Area Express (MAX), which is operated by the Tri-County Metropolitan Transportation District

---

[1] "Williams" hereinafter refers solely to Ebony Williams.

2 - OPINION AND ORDER

of Oregon (Tri-Met).  The attack was recorded by MAX's closed-circuit television camera, which captured images of an African-American female suspect who appeared to be between fifteen and twenty-years-old, had her hair in a pony-tail or a bun, and wore a green jacket with a fur-fringed hood.  Portland Police Officer John Blair was assigned to investigate the incident.  As part of the investigation, Officer Blair assembled still photos of those involved in the attack and created flyers to identify the suspects.

On June 29, 2005, at approximately 2:45 p.m., a Tri-Met employee was monitoring a closed-circuit television feed of the Yellow Line MAX station at Interstate and Lombard streets.  The employee alerted Officer Blair that an African-American female who appeared to be fifteen to twenty-years-old, had her hair in a pony tail, and wore a green jacket with a fur-fringed hood was standing at the platform.  After Blair examined one of the flyers, he determined he had reasonable suspicion to detain the person to investigate the June 9, 2005, attack based on similarities between her and the images recorded on the closed-circuit television, including physical resemblance, hair style, and color and style of jacket.  Blair also testified he thought it would be difficult to find the person if she boarded a MAX train before an officer arrived.  This person later was identified as Williams.

3 - OPINION AND ORDER

Officer Blair spoke to Tri-Met Officer Jerry Winter and asked him to determine whether the person, Williams, would come to Tri-Met's offices for an interview about the attack.  If Williams was unwilling to do so, Blair told Winter that he should keep her at the platform until Blair could get there.  Winter then drove in the direction of the Interstate and Lombard MAX station.

At that time, Sergeant Pamela Rosentreter was on duty in North Portland driving a marked patrol car.  At approximately 2:46 p.m., Rosentreter heard a Tri-Met officer speaking on the radio channel dedicated to Portland's North Precinct.  The record does not reflect precisely what the Tri-Met officer said. Rosentreter, however, "understood the Tri-Met officer wanted a police officer to proceed to [Plaintiff's] location and detain her for Tri-Met."  Rosentreter Aff. ¶ 6.  Rosentreter testified: "I believed a Tri-Met official had said or indicated that Tri-Met had probable cause for assault relating to the suspect on the Max platform."  Rosentreter Supple. Aff. ¶ 2.

While on her way to the scene, Sergeant Rosentreter asked a Bureau of Emergency Communications (BOEC) dispatcher to repeat the description and location of the suspect, which the BOEC did. Rosentreter arrived on the scene, parked her patrol car at a gas station across the street, and walked to the MAX station.  As she approached Williams, Rosentreter radioed Tri-Met to confirm that

4 - OPINION AND ORDER

Williams was the person who should be detained.  At that moment,
a MAX train pulled in and blocked the closed-circuit television
camera and the Tri-Met officer's view.  Rosentreter called to
Williams to wait, grabbed her by the upper arm, and asked her
name.  Williams stated her name, and Rosentreter radioed to ask
whether "Williams" was the name of the suspect.  After the MAX
train pulled out, the Tri-Met Officer confirmed Williams was "the
right one."

Sergeant Rosentreter took Williams into custody at
approximately 2:51 p.m., but did not give her any *Miranda*
warnings at any time.  Rosentreter handcuffed Williams and walked
her from the MAX platform to the parked patrol car, which was
about 75 feet away.  Although Williams asked to call her father,
Rosentreter did not respond.  At the patrol car, Rosentreter
patted down Williams.  According to Williams, Rosentreter also
emptied the contents of Williams's purse onto the patrol car and
searched them.

Sergeant Rosentreter then placed Williams in the patrol car,
explained there had been a recent assault on MAX, and advised
Williams that Tri-Met officers would be there shortly.  Williams
was not carrying identification.  Rosentreter ran a Mobil Data
Terminal check on William's identity at approximately
2:56 p.m.

Sergeant Rosentreter waited in the patrol car with Williams

5 - OPINION AND ORDER

until Tri-Met Officer Winter arrived.  At that time, Rosentreter removed Williams from the car, took the handcuffs off of Williams, and transferred Williams to Tri-Met Officer Winter's custody at approximately 3:01 p.m.  Winter re-handcuffed Williams and placed her in a vehicle for transport to the Tri-Met offices.

Sergeant Rosentreter cleared the initial call and made herself available for other police work.  Defendants assert the contact between Rosentreter and Williams lasted between seven and ten minutes.

Tri-Met Officer Winter drove Williams to the Tri-Met offices at 210 N.W. First Avenue, Portland, which took approximately 14 minutes.  At the Tri-Met offices, Williams exited the vehicle. The handcuffs were removed after Officer Blair came out to meet Williams.  Blair told Williams that she was free to leave, but he asked her to stay to answer questions about the attack on June 9, 2005.  Williams agreed to stay and followed Blair into an office area.  Williams was shown images of the suspect, which she denied was her.  Blair determined Williams was not the suspect and directed another officer to give Williams a ride home.  Computer Aided Dispatch records indicate Williams was dropped at her home at approximately 3:41 p.m.

On March 14, 2006, Plaintiffs filed this action against Defendants City of Portland, Pamela Rosentreter, John Blair, and Jerry Winter.  On November 1, 2006, Plaintiffs voluntarily

dismissed Defendants Blair and Winter as defendants.

On December 8, 2006, the remaining Defendants filed this Motion for Summary Judgment as to all of Plaintiffs' claims.

As noted, the Court heard oral argument on March 7, 2007, and took the Motion under advisement at that time.


**STANDARDS**

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters*

7 - OPINION AND ORDER

*Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required.  *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).


## DISCUSSION

**I.   Plaintiffs' § 1983 Claim Against Sergeant Rosentreter.**

In their § 1983 claim, Plaintiffs allege Sergeant Rosentreter arrested Williams without probable cause and thereby violated Williams's Fourth Amendment right to be free from unreasonable search and seizure.

Defendants, however, contend Sergeant Rosentreter merely conducted a *Terry* stop supported by reasonable suspicion. Defendants also contend Rosentreter is protected by qualified

8 - OPINION AND ORDER

immunity because she reasonably relied on instructions from other law-enforcement personnel who had knowledge of the relevant facts.

**A.    *Terry* Stops and Arrests Generally.**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV, § 1.

In *Terry v. Ohio*, the Supreme Court held stopping and frisking a person constitutes a seizure under the Fourth Amendment. 392 U.S. 1, 9 (1968). In *Morgan v. Woessner*, the Ninth Circuit explained:

> Stops under the Fourth Amendment fall into three categories.  First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave.  Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures.  Second, the police may "seize" citizens for brief, investigatory stops. This class of stops is not consensual, and such stops must be supported by "reasonable suspicion."  Finally, police stops may be full-scale arrests.  These stops, of course, are seizures, and must be supported by probable cause.

9 - OPINION AND ORDER

997 F.2d 1244, 1252 (9th Cir. 1993)(citations omitted).

A police officer may conduct a brief stop for investigatory purposes when the officer has "reasonable suspicion" to believe the stopped individual has committed wrongdoing. *See Terry*, 392 U.S. at 23-27. *See also Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1996). "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)). Reasonable suspicion requires only "a minimal level of objective justification." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). A court must consider the totality of the circumstances when determining whether reasonable suspicion existed. *United States v. Osborn,* 203 F.3d 1176, 1181 (9th Cir. 2000).

The Ninth Circuit has noted "[t]here is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

> Rather, in determining whether stops have turned into arrests, courts consider the totality of the circumstances. As might be expected, the ultimate decision in such cases is fact-specific.
>
> In looking at the totality of the circum-stances, we consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's

> liberty was restricted and the justification
> for the use of such tactics, i.e., whether
> the officer had sufficient basis to fear for
> his safety to warrant the intrusiveness of
> the action taken.  In short, we decide
> whether the police action constitutes a *Terry*
> stop or an arrest by evaluating not only how
> intrusive the stop was, but also whether the
> methods used were reasonable *given the
> specific circumstances*.  As a result, we have
> held that while certain police actions
> constitute an arrest in certain
> circumstances, e.g., where the "suspects" are
> cooperative, those *same* actions may *not*
> constitute an arrest where the suspect is
> uncooperative or the police have specific
> reasons to believe that a serious threat to
> the safety of the officers exists.  The
> relevant inquiry is always one of
> reasonableness under the circumstances.

*Id.* (citations omitted; emphasis in original).  *See also*

*Halvorsen v. Baird*, 146 F.3d 680, 684 (9th Cir. 1998).

To determine whether a detention was an arrest or merely an

investigatory stop, the court may consider whether a reasonable

person would have felt free to leave after brief questioning.

*Allen*, 73 F.3d at 235.  Certain circumstances may justify

restraint or lengthy detention of a person for whom there is no

probable cause to arrest.  For example, such action may be

appropriate when the police diligently pursue an investigation

that is likely to confirm or to dispel their suspicions of the

individual quickly.  *Halvorsen*, 146 F.3d at 684.  Police officers

also may use intrusive means of effecting a stop when the suspect

is uncooperative, the stop closely follows a violent crime, or

the officers have information that the suspect is armed.

11 - OPINION AND ORDER

*Washington*, 98 F.3d at 1189.  A stop, therefore, is not automatically converted into an arrest when officers use handcuffs or place the suspect in a police car for questioning. *Allen*, 66 F.3d at 1056.  The relevant inquiry is one of reasonableness under all of the circumstances.  *Id.* at 1057.

At some point, however, the degree of force, proximity, and duration of the events can convert a stop into an arrest. *Compare Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002)(*Terry* stop not converted to an arrest when officers ordered the plaintiff from a car at gunpoint and handcuffed, frisked, and placed the plaintiff in a patrol car for 45 minutes while officers investigated; the plaintiff was fully compliant; and the officers did not believe a particularized danger existed) to *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996)(*Terry* stop converted to an arrest when police ordered the plaintiffs from a car at gunpoint and frisked, handcuffed, and placed them in patrol cars while officers investigated allegations; the plaintiffs were compliant; and the officers had only a generalized concern that the plaintiffs might be armed). *See also United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990)(there was a "lack of investigatory justification for" officers to handcuff the plaintiff and to make him lie on the ground even though he was suspected of drug trafficking because the plaintiff complied with officers and there was no other

evidence to suggest that the plaintiff was particularly
dangerous.).

   **B.   Whether Williams's Detention Constituted a *Terry* Stop
          or an Arrest.**

   Although Defendants conceded at oral argument that there was
not any probable cause to arrest Williams, Defendants maintain
Officer Blair had reasonable suspicion to direct a *Terry* stop,
and Sergeant Rosentreter's detention of Williams was nothing more
than a *Terry* stop.  Plaintiff, however, asserts the totality of
circumstances, including Williams's age and Rosentreter's
allegedly inordinate use of force, converted the detention into
an arrest.

   In *Gallegos*, a woman telephoned 9-1-1 to report that her
father was violating a restraining order by trying to break into
her house.  She described him as an Hispanic male who was wearing
a red shirt and blue pants.  308 F.3d at 989.  The plaintiff,
also an Hispanic male who coincidentally also was wearing a red
shirt, exited his home near the scene of the attempted break-in
and drove away in his truck.  Officers pulled him over, ordered
him out of the truck at gunpoint, handcuffed him, and placed him
in the back of a police car.  *Id.*  After forty-five minutes,
officers learned the plaintiff was not the right person and drove
him back to his vehicle.  *Id.*  The Ninth Circuit held the
plaintiff's detention did not exceed the scope of an
investigatory stop.  *Id.* at 992.  As the court noted, the "whole
13 - OPINION AND ORDER

point of an investigatory stop . . . is to allow police to
*investigate* . . . to make sure that they have the right person."
*Id.* at 991 (emphasis in original).  Ultimately, the court
concluded the investigatory stop "worked as it should" because
officers were able to rule out the plaintiff as a suspect.  *Id.*

Unlike *Gallegos*, however, the record in this matter does not
conclusively demonstrate Sergeant Rosentreter detained Williams
only to confirm or to eliminate the possibility that Williams was
a suspect in the earlier attack.  The evidence is susceptible to
at least two objectively plausible interpretations:  Under one
view, Rosentreter was merely aiding Tri-Met by effectuating an
investigatory *Terry* stop "calculated solely to make sure [the
officers] had the right" suspect and holding Williams until Tri-
Met Officer Winter arrived.  *Id.*  Under the second view,
Rosentreter arrested Williams based on Rosentreter's
interpretation of the Tri-Met officer's dispatch that there was
probable cause to arrest a "suspect."  Unfortunately, the record
does not reflect the specific words spoken by the Tri-Met officer
in his radio broadcast nor is there sufficient evidence to
determine whether Sergeant Rosentreter's belief that there was
probable cause to arrest Williams was objectively reasonable.
Thus, on this record, the Court is unable to determine whether
either interpretation is significantly more probable.

By comparison, the detention in *Gallegos* occurred in

imminent proximity to a 9-1-1 call reporting a breaking-and-
entering restraining-order violation. *Id.* at 989. Here the June
9, 2005, attack took place nearly three weeks before Williams was
detained. Although Sergeant Rosentreter stated in her Affidavit
that she thought she needed to protect herself and potentially to
protect Williams from harm during the detention, her concern was
only motivated by a general interest in safety rather than a
particular suspicion that Williams might be armed or dangerous.
*See, e.g., United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.
1990). In any event, Rosentreter's subjective belief is not a
sufficient basis to conclude as a matter of law that Williams's
detention was only a *Terry* stop.

The Court does not find persuasive Defendants' contention
that Sergeant Rosentreter subjectively believed she was merely
conducting a *Terry* stop because she never gave Williams her
*Miranda* rights. The Ninth Circuit has found that "the proper
focus when determining coerciveness or restraint sufficient to
constitute an arrest or detention is not on the subjective belief
of the agents. Rather we review the situation from the
perspective of the person seized." *Allen*, 73 F.3d at 235
(internal citations and emphasis omitted). Sergeant
Rosentreter's subjective belief, therefore, is not dispositive.
In any event, counsel's argument about Rosentreter's subjective
belief is contravened by Rosentreter's testimony that she

15 - OPINION AND ORDER

"believed" the Tri-Met dispatcher stated there was probable cause to detain Williams.

In summary, the Court concludes a genuine issue of material fact exists as to whether Williams's detention constituted a mere *Terry* stop or an arrest.

**C.    Whether Sergeant Rosentreter Has Qualified Immunity under these Circumstances.**

Even if Williams's detention was an arrest, Defendants contend Sergeant Rosentreter is entitled to qualified immunity under these circumstances because Rosentreter reasonably relied on the Tri-Met officer's dispatch in which she believed she heard the dispatcher state there was probable cause to detain Williams.

It is well-established that a "line officer" (*i.e.*, one who is not in charge of or leading a particular investigation) need not have the full accompaniment of knowledge that a lead officer has as long as the line officer's reliance on the instructions of the lead officer is reasonable. *See Ramirez v. Butte-Silver Bow Co.*, 289 F.3d 1022, 1028 (9th Cir. 2002).  In addition, when "an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous." *Motley v. Parks,* 432 F.3d 1072, 1082 (9th Cir. 2005).

It is unclear from this record whether Sergeant Rosentreter formed her opinion because the Tri-Met dispatcher conveyed the

16 - OPINION AND ORDER

term "probable cause" or whether Rosentreter merely misheard the call.  Thus, it cannot be determined on this record whether Rosentreter's belief was objectively reasonable.  *See Motley,* 432 F.3d at 1082.

Accordingly, because the Court must view the facts in the light most favorable to Plaintiffs, the existing issues of material fact preclude granting summary judgment to Sergeant Rosentreter on the basis of qualified immunity.

**D.  Plaintiffs' Potential Claim for Unreasonable Search.**

Plaintiffs allege for the first time in their Response that Sergeant Rosentreter searched Williams's purse before placing her in the patrol car.  Because Plaintiffs did not raise this issue in their original Complaint or their First Amended Complaint, Defendants argue the Court should "disregard and ignore" any potential claim by Plaintiffs based on this alleged occurrence. Defendants assert they would be prejudiced if Plaintiffs were allowed to pursue a claim for an illegal search of Williams's purse because discovery, depositions, and this Motion have been solely dedicated to whether Williams was subject to an illegal seizure.

Even though Defendants correctly state the nature of the proceedings to this point, the Court cannot foreclose a potential claim for an illegal search at this stage.  Plaintiffs noted in their First Amended Complaint that Claim One was intended to

17 - OPINION AND ORDER

vindicate Williams's right to be free from "unreasonable search and seizure."  Thus, Plaintiffs placed Defendants on notice that such a claim could be brought.  *See* Fed. R. Civ. P. 9(a)(2).  In any event, the mere fact that the record is undeveloped as to this issue does not entitle Defendants to summary judgment.

In summary, the Court concludes on this record that Defendants are not entitled to summary judgment as to Plaintiffs' Claim One.

## II.  Plaintiffs' IIED Claim Against the City of Portland.

Plaintiffs allege the City of Portland intentionally inflicted emotional distress on Williams.  Defendants, however, maintain Plaintiffs cannot establish two of the three required elements to establish an IIED claim.

### A.    IIED Generally.

Under Oregon common law,

> [t]o state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

*McGanty v. Staudenraus*, 321 Or. 532, 543 (1995)(quoting *Sheets v. Knight*, 308 Or. 220, 236 (1989)).

In Oregon, IIED claims against police officers are relatively rare, but such claims are not barred as a matter of

18 - OPINION AND ORDER

law.  For example, statements made by police officers in the
scope of their official duties can subject officers to IIED
claims.  *See Clifford v. City of Clatskanie*, 204 Or. App. 566,
577 (2006)(court rejected police argument that statements made in
the course of duty were immune from IIED claims because of
executive privilege or discretionary immunity).  A city also can
be vicariously liable through *respondeat superior* for IIED claims
arising from the actions of its employees.  *See Barrington v.
Sandberg*, 164 Or. App. 292, 295-96 (1999)(City of North Bend
could be liable for IIED for the conduct of a city police officer
who was also a police-cadet supervisor).  On the other hand,
Oregon courts have granted summary judgment to officers as to
IIED claims that merely arose from the officers' performance of
their job.  *See Downs v. Waremart, Inc.*, 137 Or. App. 119, 140
(1995), *rev'd on other grounds by* 324 Or. 307 (1996).  *See also
Pakos v. Clark*, 253 Or. 113, 132 (1969)(officer's comments that
the plaintiff was "crazy as a bedbug," the officer was going to
put him in an asylum, and the officer was going to take away his
children were not extreme or outrageous conduct).

    A.   **Plaintiffs Have Not Shown Defendants Intended to
Inflict Severe Emotional Distress on Williams.**

To establish that Defendants "intended" to inflict severe
emotional distress on Williams, Plaintiffs must show Defendants
either acted with a specific desire to inflict severe emotional
distress or acted in such a way that "the actor . . . knows that

19 - OPINION AND ORDER

such distress is certain, or substantially certain, to result
from his conduct." *McGanty*, 321 Or. at 550 (quotations and
emphasis omitted).

Here Plaintiffs allege the mere fact of Williams's detention
establishes that Defendants intended to inflict emotional
distress on her. Plaintiffs note Williams was a minor when the
incident occurred and contend she was treated harshly under the
circumstances by being handcuffed and led away by a police
officer without a thorough explanation or a chance to telephone
her parents. The record, however, contains little, if any,
evidence that gives rise to an inference that any employee of the
City of Portland acted in such a way that Williams was
substantially certain to experience severe emotional distress.
Officers Blair and Rosentreter testified they did not intend to
inflict emotional distress on Plaintiff. Moreover, Defendants
did not use or threaten to use bodily force or chemicals like
pepper spray on Williams. No employee of the City used
derogatory names toward Williams or subjected her to threats of
any kind. In any event, the Oregon Supreme Court has found even
an officer's threat to place a plaintiff in an asylum and take
his children away did not state an IIED claim. *See Pakos*, 253
Or. at 132.

The Court concludes on this record that Plaintiffs have not
established that the City of Portland intended to inflict severe

20 - OPINION AND ORDER

emotional distress on Williams.

**C.** **Plaintiffs Have Not Established Defendants' Acts Constitute an Extraordinary Transgression of the Bounds of Socially Acceptable Conduct.**

Even if Plaintiffs established Defendants had the required intent, Plaintiffs must show Defendants' conduct was an extraordinary transgression of the bounds of socially tolerable conduct. *See McGanty*, 321 Or. At 543. Whether conduct constitutes such a transgression is a question of law. *Harris v. Pameco Corp.*, 170 Or. App. 164, 171 (2000). *See also Delaney v. Clifton*, 180 Or. App. 119, 129 (2002). Conduct, however, that is merely "rude, boorish, tyrannical, churlish and mean" but still not outrageous in the extreme does not transgress the bounds of socially acceptable conduct. *See Patton v. J. C. Penny Co., Inc.*, 301 Or. 117, 124 (1986), *abrogated on other grounds by McGanty*, 321 Or. at 545.

Plaintiffs contend Sergeant Rosentreter's conduct constituted an extraordinary transgression of the bounds of socially acceptable behavior because she did not allow Williams to call her parents even though Williams was a teenager who was compliant at all times.

Viewed in the light most favorable to Plaintiffs, neither Plaintiffs' assertions nor the record reflect any employee of the City of Portland committed an extraordinary transgression under the circumstances: Williams's detention lasted about one hour

21 - OPINION AND ORDER

and arose in the context of a criminal investigation; Sergeant Rosentreter did not forcefully handle Williams; Williams was not insulted or subjected to racial epithets or derogatory comments. At the conclusion of the incident, Williams was driven home by a police officer.  Thus, there is not any evidence in the record to indicate Defendants' conduct rose to even the level of "rude, boorish, tyrannical, churlish and mean" much less exceeded that level.  *See Patton*, 301 Or. at 124.

Accordingly, the Court on this record grants Defendants' Motion for Summary Judgment as to Plaintiffs' Claim Two.

<u>**CONCLUSION**</u>

For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (#27) as to Claim One and **GRANTS** Defendants' Motion for Summary Judgment (#27) as to Claim Two.

IT IS SO ORDERED.

DATED this 16th day of April, 2007.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

22 - OPINION AND ORDER